55 CCPA

**Paul E. BAKER, Stanley B. Jones and Delmar O. Seevers, Appellants,**

v.

**Robert S. CODRINGTON and Nick A. Schuster, Appellees.**

**Patent Appeal No. 7819.**

United States Court of Customs and Patent Appeals.

Feb. 1, 1968.

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

George W. Wasson, Edward J. Keeling, San Francisco, Cal., for appellants.

Francis J. Hone, New York City (Brumbaugh, Free, Graves & Donohue, New York City, of counsel), for appellees.

Before WORLEY, Chief Judge, RICH, SMITH and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK *.

RICH, Judge.

This appeal is from a decision of the Board of Patent Interferences,[1] adhered to on reconsideration, awarding priority to Codrington et al., junior party in interference No. 93,105, involving Codrington et al. (hereinafter Codrington) application serial No. 675,061, filed July 30, 1957, entitled "Detection of Oil by Nuclear Magnetic Resonance" and Baker et al. (hereinafter Baker) application serial No. 762,291, filed September 22, 1958, entitled "Analytical Device." The single count of the interference is:

1. A method for detecting the presence of oil in a well formation comprising introducing into the formation paramagnetic ions operative to reduce selectively the nuclear magnetic resonance precession relaxation time of protons in water with respect to those in oil, inducing nuclear magnetic resonance precession in protons present in the formation, and measuring the nuclear magnetic resonance precession relaxation times of the protons present in the formation.

In the detection of oil by nuclear magnetic resonance, electrical signals, indicative of the precession of the magnetic moments of protons, are picked up inside a well bore. These signals are induced by changing the alignment of the protons by subjecting the hydrogen atoms to a

1. Consisting of Williams, Levin, and Willner, Examiners of Interferences, opinion by Willner.

magnetic field. Relaxation time may be thought of, for our purposes, as the time within which the protons align themselves with the magnetic field. The precessional signals are analyzed to determine relaxation times and, indirectly, the source of the signal, since relaxation times are ordinarily distinctive for various nuclei.

These measurements, however, are often incapable of distinguishing between the protons of oil and those of water because the relaxation times of the two are so similar under conditions which obtain in the wells. It was known to the prior art that paramagnetic materials effect a reduction in the relaxation time of the protons. The invention of the count requires introduction of these materials *in ionic form* by which the relaxation time of the protons in water is reduced *selectively* with respect to those in oil. A measurable difference between the compounds is thereby established and identification of oil and water in the wells is facilitated.

Appellees, the junior party, have alleged no date earlier than appellants' effective filing date. Under an order to show cause why judgment should not be entered against them, appellees moved to dissolve the interference on the ground that the count was not supported by appellants' disclosure. In particular, appellees argued that the essential limitation in the count, viz., the introduction of paramagnetic ions into the formation, was unsupported.

In denying the motion to dissolve, the examiner said:

> * * * since the disclosure fails to particularly state that the elements are present in *uncharged* particle form it must be fairly assumed in the light of the prior disclosure relating to *charged particles* that the impurities may be present in charged particle form or *ions*.

The board did not agree. It conceded that appellants' disclosure came quite close to the subject matter of the count.

It found, however, "no suggestion or instruction * * * for introducing a paramagnetic impurity for the purpose of differentiating oil and water in the formation when their relaxation times therein are otherwise too close." The board pointed especially to the absence of any suggestion to introduce the impurity "in the form of 'ions operative to reduce selectively, etc.'."

There is no need here for a description of appellants' specification. They acknowledge its apparent inadequacy but they argue that the board erred:

> By an apparent failure to consider all of the file in the Codrington et al case, the Board was led to conclude that because the Baker et al application did not include the word "ions" that Baker et al intended to disclose something other than ions. In spite of the fact that the Board was presented with evidence indicating that *ions, paramagnetic impurities*, and *paramagnetic materials* were quite synonymous, and in spite of the fact that the references cited by the Patent Office during prosecution of the Codrington et al application definitely indicate *that the words are both synonymous and regularly interchanged*, the Board ruled that the Baker et al application did not support the count.

Appellees argue that the appellants' specification is inadequate in that it neither discloses the introduction of paramagnetic ions nor selective reduction of relaxation time of the protons in the formation. They also argue that appellants' assignee has conceded lack of support for the count.

We need only deal with the first of appellees' contentions. We agree with appellees that appellants' specification does not provide for the introduction of paramagnetic ions.

Appellants urge that "ions," "paramagnetic impurities," and "paramagnetic materials" are synonymous in the well-drilling art. In support of this contention appellants point to an article [2] by

2. 70 Phys.Rev. 474 (1946).

Bloch, Hansen, and Packard. Appellants argue:

> In their observations * * * [Bloch, Hansen and Packard] suspected that the origin of a discrepancy in the measurement of relaxation times to be caused by slight impurities * * * and particularly, in their case, by oxygen dissolved in water. In their article they make eight references to the materials that they feel have caused this observed effect upon relaxation times. It is important to note that while the authors are always referring to the same type of materials, in six of these references they refer to the materials as "impurities", that in only one case do they refer to these impurities as "ions", and in one other case they refer to the impurities as "paramagnetic salt". These authors use these terms interchangeably.

A cursory examination of the article shows the contrary to be true. The first part of the article discusses paramagnetic impurities in a general way and mentions specifically only oxygen, a non-ionic paramagnetic impurity: "We suspected the origin of this discrepancy to be caused by slight impurities and particularly to [sic, by?] oxygen dissolved in water." The paramagnetic salt and ion mentioned in the article are ferric nitrate and the ferric ion respectively, both ionic impurities. The latter were the only impurities actually *introduced* by the authors into water. The others were merely found in the fluids. Interestingly, the ionic impurities are never referred to as impurities at all, although they doubtless could have been.

Appellants also cite a second article[3] which refers to the first as follows:

> The addition of paramagnetic ions to water, as was first shown by Bloch, Hansen, and Packard, can influence markedly the proton relaxation time.

Appellants argue:

> And yet when reference is had to the Bloch, Hansen and Packard article it will be found that the authors of that article referred to the materials that influenced the proton relaxation time as *impurities*.

And the authors undeniably did refer to such materials as impurities. They did show the addition of paramagnetic ions to water. But they did not use "impurities" and "ions" as synonyms.

Appellants also argue that, because ions are well known in drilling fluids, their "impurities" somehow must be ionic. The fallacy is obvious.

Appellants finally urge:

> It is well known and recognized in the petroleum and well logging arts that the filter created along the face of the well bore by the deposition of a cake from the drilling mud in the well is a very fine (small hole) filter. Any material that passes into the formation must go through this filter and the passage of any material through the filter is accomplished only with deliberate and substantial difficulty. The pores of the mud cake filter along a well bore are subcolloidal and almost molecular in size so that the passage of any material through this filter requires that the material be of extremely small size.

We see no reason why non-ionic dissolved impurities, e. g., molecular oxygen, could not pass this test. Appellants say further:

> Those skilled in the well drilling arts and particularly those skilled in petroleum production would have no question in their mind of the form of the material that would pass through a mud cake into the formation. See Composition and Properties of Oil Well Drilling Fluids, W. F. Rogers, Gulf Publishing Co., 1953 (cited in the Codrington and Schuster application). The material is known to them to be part of the filtrate and they would know that the material in solution in the filtrate would be in solution in ionic form.

3. Bloembergen, Purcell and Pound, 73 Phys.Rev. 679–712 (1948).

For the same reason, we do not think this is a valid inference.

Because we are unpersuaded by appellants' arguments, the decision of the board is affirmed.

Affirmed.